994 So.2d 101 (2008)
Anthony CROOKS, et al.
v.
LCS CORRECTIONS SERVICES, INC., et al.
John Spellman, et al.
v.
LCS Corrections Services, Inc., et al.
Nos. 2007 CA 1901, 2007 CA 1902.
Court of Appeal of Louisiana, First Circuit.
August 21, 2008.
Rehearing Denied September 25, 2008.
*105 Andre P. LaPlace, Baton Rouge, Patrick W. Pendley, Plaquemine, Michelle H. Hesni, George Hesni, II, Davidson S. Ehle, III, Gretna, for Plaintiffs-Appellees Anthony Crooks, et al. and John Spellman, et al.
W. Glenn Burns, Joseph L. Spilman, III, David C. Fawley, David C. Bach, Halley, McNamara, Hall, Larmann & Papale, L.L.P., Baton Rouge, for Defendant-Appellant LCS Corrections Services, Inc.
Robert E. Barkley, Jr., Nicholas D. Doucet, Barkley & Thompson, L.C., Lafayette, for Defendant-Appellant Union Tank Car Company.
Before: PARRO, KUHN, and DOWNING, JJ.
PARRO, J.
LCS Corrections Services, Inc. (LCS) and Union Tank Car Company (UTC) appeal a class certification judgment in one of two consolidated suits stemming from a Union Pacific Railroad (UPRR) train derailment. For the following reasons, we affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND
On May 27, 2000, there was a train derailment near Eunice, Louisiana. Seventeen of the derailed cars contained hazardous materials. Seven of these were breached during the derailment, and two tank cars filled with methyl chloride exploded. One acrylic acid car and two TDI[1] cars were intentionally breached with explosives by emergency responders. Sixty-nine cars that did not derail were moved to a site in Basile, Louisiana, where one of them leaked ethylene oxide for several days. As a result of the derailment, explosions, and fires, 944,150 pounds of corrosive liquids and 167,685 gallons of flammable liquids and poisons were released. The National Transportation Safety Board determined that the probable cause of the derailment was UPRR's track inspection procedures, which had failed to detect defective track joint bars.
LCS operates the South Louisiana Correctional Center (SLCC) in Basile, Louisiana, about 7.5 miles west of the derailment. Anthony Crooks, an inmate at SLCC at the time of the derailment, filed a class action suit (the Crooks suit) against LCS and UPRR on August 16, 2000, seeking damages for alleged exposure to toxic substances due to LCS's failure to evacuate him and other inmates from the prison or "shelter in place," and for denial of medical treatment.[2] Crooks did not move to certify a class within 90 days, and on the defendants' motion, his class action request was stricken from the petition on March 26, 2001. He then amended his petition, joining about 495 additional inmates with individual claims and adding several additional defendants. UTC was not named as a defendant in the Crooks suit.
John Spellman, another inmate at SLCC, filed a separate, almost identical petition on May 16, 2001, seeking to represent all others similarly situated in a class *106 action (the Spellman suit). The claims against LCS are the same in both suits. Spellman's motion for class certification was filed with his petition. On September 17, 2001, over the opposition of both Crooks and Spellman, the court consolidated the Spellman class action suit with the Crooks multiple-plaintiff suit. Crooks and Spellman sought a writ on the consolidation issue, which was denied. Spellman's petition was later amended to include a subclass of current and former LCS employees who were at SLCC during the derailment and cleanup period. In a subsequent amended petition, UTC was added as a defendant in the Spellman suit. UTC owned a car that was leased to Dow and carried ethylene oxide (EO). That car, along with others that had not derailed, was moved from the derailment site to a location about a mile away from the prison in Basile; it began to vent EO from a safety release valve on May 29, 2000. The claims against UTC involve its allegedly negligent installation of the valve several months earlier in Texas, and include a demand for exemplary damages under Texas law.[3]
Some of the claims in these consolidated actions have already been settled. Spellman, Crooks, Phillips Petroleum Company, and Huntsman Petrochemical Corporation entered into a class settlement that was approved by the court, in which the settlement class was defined as "All persons present at the South Louisiana Correction Center at Basile Louisiana, at any time between May 27, 2000 and June 2, 2000." The next class settlement resolved all of the consolidated plaintiffs' claims against UPRR and Dow made by all persons present at SLCC between May 27 and June 2, 2000. Eventually, the plaintiffs in these consolidated suits also settled with the State of Louisiana.
LCS filed a peremptory exception raising the objection of res judicata in the Spellman suit on the issue of class certification, since it had already been denied in the Crooks suit. The exception was overruled, and LCS's writ application to this court was denied. On February 26, 2007, the trial court held a hearing on Spellman's motion for class certification. UTC and LCS opposed the motion. Spellman's attorneys asked for leave to substitute Crooks as the class representative.[4] The court granted that request and the request for class certification, providing only oral reasons. The court discussed the requirements of LSA-C.C.P. art. 591(A) and found that all of these were met; it also concluded that the requirements of LSA-C.C.P. art. 591(B)(3) were satisfied. The judgment was signed on June 11, 2007, and certified the class in the Spellman suit as follows:
1. As to defendant LCS Corrections Service, Inc., the class consists of all persons incarcerated at the LCS Corrections Services, Inc. facility known as South Louisiana Corrections Center, located in Basile, Louisiana, and who claim to have sustained personal injury as a result of the derailment, explosions, fires and toxic chemical releases which occurred on or about May 27, 2000 between Basile, Louisiana and Eunice, Louisiana; and
2. As to defendant Union Tank Car Company, the class consists of all persons incarcerated at or employed with the LCS Corrections *107 Services, Inc. facility, known as South Louisiana Correctional Center, located in Basile, Louisiana, and who claim to have sustained personal injury as a result of the derailment, explosions, fires and toxic chemical releases which occurred on or about May 27, 2000 between Basile, Louisiana and Eunice, Louisiana. (Emphasis added).
The judgment named Crooks as the sole representative of the class. There was no separate class representative named to represent the LCS employees, and the individual claims in the consolidated Crooks suit were not affected by the judgment.
LCS and UTC appeal that judgment, claiming the court's factual findings in its oral reasons and the judgment are manifestly erroneous, that the court's decision to certify the class is an abuse of discretion, and that the appointment of Crooks as class representative was inappropriate and manifestly erroneous.

APPLICABLE LAW
Louisiana Code of Civil Procedure article 591, which governs class actions, states, in pertinent part:
A. One or more members of a class may sue or be sued as representative parties on behalf of all, only if:
(1) The class is so numerous that joinder of all members is impracticable.
(2) There are questions of law or fact common to the class.
(3) The claims or defenses of the representative parties are typical of the claims or defenses of the class.
(4) The representative parties will fairly and adequately protect the interests of the class.
(5) The class is or may be defined objectively in terms of ascertainable criteria, such that the court may determine the constituency of the class for purposes of the conclusiveness of any judgment that may be rendered in the case.[5]
B. An action may be maintained as a class action only if all of the prerequisites of Paragraph A of this Article are satisfied, and in addition:
* * *
(3) The court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to these findings include:
(a) The interest of the members of the class in individually controlling the prosecution or defense of separate actions;
(b) The extent and nature of any litigation concerning the controversy already commenced by or against members of the class;
(c) The desirability or undesirability of concentrating the litigation in the particular forum;
(d) The difficulties likely to be encountered in the management of a class action;
(e) The practical ability of individual class members to pursue their claims without class certification;
(f) The extent to which the relief plausibly demanded on behalf of or against the class, including the vindication of *108 such public policies or legal rights as may be implicated, justifies the costs and burdens of class litigation.... (Footnote added).
An appeal may be taken as a matter of right from an order or judgment certifying a class. See LSA-C.C.P. art. 592(A)(3)(b). The only issue to be considered by the trial court in ruling on certification and by this court on review is whether the case at bar is one in which the procedural device of a class action is appropriate. In determining the propriety of a class action, the court is not concerned with whether the plaintiffs have stated a cause of action or the likelihood that they ultimately will prevail on the merits. Robichaux v. State ex rel. Dep't of Health and Hospitals, 06-0437 (La.App. 1st Cir. 12/28/06), 952 So.2d 27, 34, writs denied, 07-0567, 07-0580, and 07-0583 (La.6/22/07), 959 So.2d 503 and 504. A trial court's decision to certify a class is a two-step process. Therefore, appellate review of such decisions also follows a two-step analysis. The trial court must first determine whether a factual basis exists for certifying the matter as a class action. These factual findings are reviewed on appeal pursuant to the manifest error standard of review. If the trial court finds that a factual basis exists for certifying the action, it then exercises its discretion in deciding whether to certify the class. This aspect of the judgment is reviewed pursuant to the abuse of discretion standard. Singleton v. Northfield Ins. Co., 01-0447 (La.App. 1st Cir.5/15/02), 826 So.2d 55, 60-61, writ denied, 02-1660 (La.9/30/02), 825 So.2d 1200. Unless a trial court committed manifest error in its factual findings or abused its discretion in deciding that class certification is appropriate, the appellate court must affirm the trial court's determination. See Boudreaux v. State, Dep't of Transp. and Dev., 96-0137 (La.App. 1st Cir.2/14/97), 690 So.2d 114, 119.

DISCUSSION
The first step in this court's review is to examine the evidentiary underpinnings of the court's factual findings to determine if they were manifestly erroneous. The two-part test for the appellate review of a factual finding is: 1) whether there is a reasonable factual basis in the record for the finding of the trial court; and 2) whether the record further establishes that the finding is not manifestly erroneous. Mart v. Hill, 505 So.2d 1120, 1127 (La. 1987). Thus, if there is no reasonable factual basis in the record for the trial court's finding, no additional inquiry is necessary to conclude there was manifest error. However, if a reasonable factual basis exists, an appellate court may set aside a trial court's factual finding only if, after reviewing the record in its entirety, it determines the trial court's finding was clearly wrong. See Stobart v. State, through Dep't of Transp. and Dev., 617 So.2d 880, 882 (La.1993).

Numerosity
Generally, a class action is appropriate whenever the interested parties appear to be so numerous that separate suits would unduly burden the courts, and a class action would "clearly be more useful and judicially expedient than the other available procedures." Cotton v. Gaylord Container, 96-1958 (La.App. 1st Cir.3/27/97), 691 So.2d 760, 768, writ denied, 97-0800 (La.4/8/97), 693 So.2d 147. The plaintiffs must also demonstrate that joinder would be impracticable. If joinder is a practical alternative, then the class should not be certified. Royal Street Grocery, Inc. v. Entergy New Orleans, Inc., 99-3089 (La.App. 4th Cir.1/10/01), 778 So.2d 679, 684, writ denied, 01-0374 (La.4/12/01), 789 So.2d 594. In addition, this court has required that the plaintiffs *109 seeking certification meet a threshold burden of "plausibility" as a component element of a prima facie showing of numerosity. This burden of plausibility requires some evidence of a causal link between the incident and the injuries or damages claimed by sufficiently numerous class members. This prima facie showing need not rise to the status of proof by a preponderance of the evidence, as would be necessary to prevail on the merits. Boyd v. Allied Signal, Inc., 03-1840 (La.App. 1st Cir.12/30/04), 898 So.2d 450, 457, writ denied, 05-0191 (La.4/1/05), 897 So.2d 606. In a class action suit involving alleged chemical exposure, the plaintiffs must prove that toxic chemicals were dispersed as a result of the defendant's fault, that the dispersion patterns of the chemicals included areas occupied by the class, and that the levels of the chemicals dispersed were capable of causing compensable harm. Daniels v. Witco Corp., 03-1478 (La.App. 5th Cir.6/1/04), 877 So.2d 1011, 1016, writs denied, 04-2283 and 2287 (La.11/19/04), 888 So.2d 204 and 205.
The lower court's oral reasons concerning this factor stated:
We're talking about 800 some odd individuals. It's not impossible, but 800 separate trials, it would be impractical. I've got to consider judicial economy, and would a large number of individual suits be a burden on the Court, and my unequivocal answer to that query is yes.
The only factual finding made by the court is that there were over 800 claimants in the consolidated suits. This number is supported by the record. The affidavit of Michael P. Bellon, a former employee of SLCC, stated that on May 27, 2000, SLCC had approximately 850 inmates and 150 employees. However, LCS and UTC contend the plaintiffs did not establish that joinder is impracticable, since there are approximately 495 individual claimants already joined in the Crooks suit, and they have demonstrated their ability to pursue their individual claims. Moreover, they argue that joinder is possible because the identities of the class members are easily ascertainable, since all were either inmates or employees at LCS.
This case is certainly unusual, in that a class action is generally not consolidated with a suit involving numerous individual claimants. However, the 495 plaintiffs who have individual claims against LCS in the Crooks suit are subsumed within the definition of the class that was certified in the Spellman suit as to both LCS and UTC. Accordingly, unless they "opt out" of the class, the decisions made in the Spellman class action suit will determine their individual claims in the Crooks suit also. If the history of these suits and related litigation is any guide, most of the Crooks plaintiffs are likely to pursue their claims by way of the class action. The Crooks plaintiffs have been included in the various settlement classes that have already occurred in these cases. While joinder of all the individuals with potential claims is not impossible, we agree with the trial court that joinder is not practicable and their claims are more expeditiously handled in the class action.
With respect to the "plausibility" of the claims, LCS and UTC contend the plaintiffs produced no evidence of exposure to hazardous materials or of a causal link between the derailment and the injuries claimed by the class members whose deposition testimony and claim forms were in the record. Therefore, having failed to produce evidence that SLCC was within the geographic limits of potentially harmful exposure, LCS and UTC urge that the plaintiffs failed to meet the "plausibility" requirement for a finding of numerosity. However, we find there was some evidence in the record from which the court could *110 conclude that hazardous materials related to the derailment reached SLCC. Bellon's affidavit stated that throughout the time of the derailment and remediation, chemical mists, incinerated ash, acrid odors, and visible plumes of smoke were all present at intermittent times at SLCC. Crooks and Spellman stated that they experienced symptoms "from exposure to the chemical odors and smells coming from an ethylene oxide tank car on the Union Pacific track in very close proximity to the correctional facility at Basile, Louisiana." A former nurse at SLCC, Maxine Kennedy, averred that after the derailment, many inmates complained of burning eyes, skin irritation, headaches, and nausea. The record includes documents describing the injuries that may be caused by the various toxic materials that were released, and these correspond with many of the symptoms described by the inmates in the days following the derailment. While these statements do not establish that any of the exposures were sufficient to cause the symptoms being complained of, the statements do establish that there were physical properties, such as smoke, ash, odors, and fumes, in the SLCC area, and that some inmates and employees experienced physical problems corresponding to what would be expected from exposure to certain chemicals that were released. Therefore, we are satisfied that the plausibility requirement has been met.
Based on our review of the evidence in the record, we conclude there was a reasonable factual basis for the trial court's finding that the numerosity requirement was met, and the record does not show that this finding was clearly wrong.

Commonality
The test of commonality requires only that there be at least one issue, the resolution of which will affect all or a significant number of the putative class members. Duhe v. Texaco, Inc., 99-2002 (La.App. 3rd Cir.2/7/01), 779 So.2d 1070, 1078, writ denied, 01-0637 (La.4/27/01), 791 So.2d 637. The trial court commented that all claimants alleged they were affected by toxic materials that were discharged into the atmosphere from the "derailment with some fires" and/or the "subsequent venting of one tank car" during the "small window of May 27 to June 2." The court also noted that the only differences between the claims are the degree and amount of damages; the nature of the claims were "so similar as to almost be identical, and they do arise ... from a common source...." We note that the key common issue is exposure at SLCC to an injury-causing level of the toxic materials; if this can be established, the claims of all or a significant number of the class members will be affected. Our review of the record shows that a reasonable factual basis exists for the court's finding, and the court did not manifestly err in finding the requirement of commonality was met.

Typicality
Generally, the claims of the representative party should be a cross-section of, or typical of, the claims of all class members. Lewis v. Texaco Exploration and Prod. Co., Inc., 96-1458 (La.App. 1st Cir.7/30/97), 698 So.2d 1001, 1012. The typicality element is satisfied if the claims of the representative party arise out of the same event, practice, or course of conduct that gives rise to the claims of the other class members and those claims are based on the same legal theory. Singleton, 826 So.2d at 63.
The trial court stated that Crooks was clearly a member of the class in the Spellman case, and the fact that class certification was denied in his initial case should not "act as an absolute bar to Mr. Crooks being a class rep" in the Spellman *111 matter. The court further stated that Crooks' claims had common elements of fact and law with the claims of the other putative class members. We note that there are undeniably some differences between the inmates' claims and the LCS employees' claims, in that the employees' claims can only be asserted against UTC, while the inmates' claims can be asserted against both UTC and LCS. Also, Crooks' and the other inmates' claims against LCS have an element that differs from the actual exposure, in that they claim LCS did not properly protect them from exposure or allow medical treatment after they were allegedly exposed to toxic materials. However, as previously noted, ultimately the claims of both inmates and employees arise out of the same event or series of events, and all of those claims are based on the legal theory that the defendants were negligent in various particulars, thus causing injury to the claimants.
We conclude that the record as a whole supports the court's conclusion that Crooks' claims were typical of the other class members. Furthermore, there was no manifest error in the court's finding of typicality.

Adequate Representation
The parties seeking to maintain a class action must demonstrate that the representative parties will fairly and adequately protect the interests of the class. LSA-C.C.P. art. 591(A)(4). The test for determining adequate representation consists of three elements: (1) the chosen class representatives cannot have antagonistic or conflicting claims with other members of the class; (2) the named representatives must have a sufficient interest in the outcome to ensure vigorous advocacy; and (3) counsel for the named representatives must be competent, experienced, qualified, and generally able to conduct the proposed litigation vigorously. Singleton, 826 So.2d at 64.
UTC argues that because Crooks did not name it as a defendant in the Crooks suit, he has no claims against it, and for that reason will not adequately represent the Spellman claimants who have named UTC as a defendant. However, this argument is specious; Crooks is among the LCS inmates who were named as putative class members in the Spellman suit. Therefore, he, along with the other claimants in that suit, has asserted claims against UTC, even though his initial suit did not name UTC as a defendant.
Another argument against the adequacy of his representation is based on the fact that Crooks is no longer incarcerated. However, we agree with the trial court's observation that the fact that he was subsequently released after the incident would not make his stake in the outcome of this litigation any different. If Crooks was injured as a result of the release of toxic chemicals, he has the same interest in recovering damages as anyone else who was injured, whether a current inmate, former inmate, current LCS employee, or former LCS employee. Furthermore, his claims do not conflict with the claims of anyone else in the class, and his strong interest in this litigation is evidenced by the facts that he was the named plaintiff in the Crooks suit and that he has agreed to serve as the class representative, even though released from incarceration.
The court also found that "counsel for plaintiffs are competent, experienced[,] and qualified." The curriculum vitae of the attorneys representing the plaintiffs show they have participated in nationwide class action suits and achieved successful results for many of their clients. Therefore, there is evidentiary support for the court's finding that Crooks will adequately represent the interests of the class, and *112 the record as a whole does not indicate that this finding was manifestly erroneous.

Objectively Definable Class
The requirement that there be a class capable of being defined objectively in terms of ascertainable criteria ensures that the proposed class is not amorphous, vague, or indeterminate. A person should be able to determine readily if he or she is a member of the class. See Singleton, 826 So.2d at 66. This is probably the easiest requirement to meet in this litigation. The relevant time period commences with the derailment on May 27, 2000, and concludes when the cleanup was complete on June 2, 2000; the location of all the claimants is limited to the SLCC site. Any person who was an LCS inmate there or an employee of LCS who worked there during the applicable time period has a potential claim. The records of LCS show exactly who meets these criteria, and therefore, the class is objectively definable. The trial court did not err in so finding.

Predominance of Common Issues and Superiority of Class Action
In addition to the five factors in Article 591(A), in order to maintain a class action, one of the requirements of Article 591(B) must also be met. In this case, the trial court found that the requirements of Article 591(B)(3) were met. Therefore, we have focused our analysis on that provision.
The trial court's verbal discussion of this requirement was rather cursory, consisting of only two sentences, as follow:
Under [Article] 591(B)(3), where the common issues of fact and law predominate and class treatment would be superior to other available methods, in essence, it's a balancing test, [i.e.,] is it going to be more efficient to proceed under these facts with a class action than other available judicatory methods? And under the facts of this case, I have no doubt in my mind it would be more efficient than other judicatory methods, that being 400 or 800 individual trials. And I do think that by proceeding via class action it's going to promote some uniformity in this Court's decision as to the similarly situated persons, and at the same time, I think without sacrificing fairness, procedurally to any of the parties.
This court will endeavor to examine the requirements of Article 591(B)(3) in more depth, in order to determine whether the lower court's decision was correct.
We have previously discussed the fact that most of the legal and factual issues in this case are common to all the members of the class. All of those present at SLCC during the relevant time period must show that levels of certain toxic chemicals sufficient to cause injury reached SLCC after the derailment. They must also establish that UTC was negligent in its handling of EO, thus allowing it to vent through a release valve when parked near SLCC. Additionally, the inmates must prove that LCS was negligent in failing to protect them from exposure and/or failing to provide medical treatment after the exposure. These are all common issues that predominate over the individual issues concerning the extent of exposure and injury to each claimant.
As previously noted, because the class was not certified in the Crooks suit, many of the members of the class in the Spellman suit are also individual plaintiffs in the Crooks suit. Yet, the plaintiffs in the Crooks suit have worked with the plaintiffs in the Spellman suit to collectively participate in settlement classes for their claims against certain defendants. Therefore, it appears that the members of the class do not have a strong interest in individually *113 controlling the prosecution of their separate actions. Additionally, the related federal litigation has been concluded, and these consolidated actions are the only remaining litigation concerning the controversy involving these claimants. The lower court is familiar with the case, having presided over the previous certifications of settlement classes. Therefore, the current forum is the most convenient place for the litigation to continue.
Additional factors weighing in favor of the court's finding that the requirements of Article 591(B)(3) were met are that the court has experience with managing class actions, as do the attorneys representing these parties. Moreover, it will be much easier for the claimants, particularly the inmate plaintiffs, to pursue their individual claims within a class action, where they are represented by competent counsel and do not have to rely on their own or inmate counsels' legal abilities to present their cases. Finally, the relief sought by the classdamages for injuries allegedly caused by the defendants' negligence, which allowed extremely hazardous and toxic materials to be released into the atmosphereseeks vindication of clear legal rights and more than justifies the costs and burdens of class litigation.
For these reasons, we agree with the lower court's finding that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Having found that the requirements of Article 591(A) and (B)(3) were met, we conclude that the court's factual findings were not manifestly erroneous and the court's certification of the class was not an abuse of discretion.

DECREE
Based on the foregoing, we affirm the class certification judgment and assess all costs of this appeal to UTC and LCS.
AFFIRMED.
KUHN, J., dissents.
NOTES
[1] The initials TDI represent toluene diisocyanate.
[2] The original petition stated LCS did "shelter in place," but a supplemental and amending petition stated that the "shelter in place" procedures were not observed following the derailment.
[3] The Crooks and Spellman suits were stayed for about four years while a related class action suit that included the plaintiffs in these consolidated suits proceeded in federal court.
[4] Apparently Spellman had attempted to unilaterally contact counsel for UTC.
[5] The five prerequisites for class action certification in Article 591(A) are generally called numerosity, commonality, typicality, adequate representation, and an objectively definable class.